UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-CR-14007-MOORE

UNITED STATES OF AMERICA

vs.

JEAN CLAUDY POLANCO,
     Defendant.
                                /

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney, and hereby respectfully files this response to the defendant's Motion for Early Termination of his Supervised Release Term. In preparation for the Government's response the undersigned spoke with the United States Probation Officer assigned to the defendant's supervision. The Government objects to the early termination of the defendant's term of supervised release at this time and respectfully submits that the defendant's motion should be denied. The United States relies on the following factual and legal support for this position.

### FACTUAL BACKGROUND

On November 19, 2008, the Florida Department of Law Enforcement (FDLE), along with the St. Lucie County Sheriff's Office, the State Attorney's Office, the Bureau of Alcohol Tobacco Firearms (ATF), and the Drug Enforcement Administration (DEA), started a state wire intercept on the cellular telephones of Todd Jackson, Sr., Todd Jackson, Jr. and Quentin Dixon. Based upon state and federal wire taps, controlled purchases of illegal narcotics, surveillance, confidential informant information, and post arrest statements, the investigation ultimately revealed that a

cocaine trafficking organization was operating in Brevard County, St. Lucie County, Palm Beach County, and Broward County, Florida.

Throughout the course of the investigation, it was learned that Todd Jackson, Sr. controlled and was responsible for the distribution of a large amount of cocaine hydrochloride, cocaine base, commonly referred to as "crack" cocaine, and MDMA pills throughout St. Lucie and Brevard Counties. Thousands of telephone calls were intercepted during the investigation, some of which established that Jackson, Sr. had two main individuals, Quentin Dixon and Todd Jackson, Jr., who acted at his direction and assisted with the organization's operations including the purchase and distribution of cocaine. Dixon was captured on hundreds of calls arranging for the purchase, cutting, packaging, and distribution of cocaine hydrochloride, as well as crack cocaine. During those calls, Jackson, Sr. instructed Dixon on how to break open the kilograms of powder cocaine, add cutting material to the cocaine hydrochloride to increase his profit base, how to cook the powder into crack cocaine, and how much his profit base ought to be. Dixon assisted Jackson, Sr. by driving to the source in Broward County to pick up cocaine, delivering the cocaine to Jackson, Sr. and also delivering money from Jackson, Sr. to the source. Jackson, Jr. was also captured on hundreds of calls arranging for the purchase, cutting, packaging, and distribution of cocaine hydrochloride, as well as crack cocaine. During those calls, Jackson, Sr. clearly used his son as a distributor of cocaine and instructed him on how to work with Dixon to increase his profit margin.

Both Dixon and Jackson, Jr. had individuals who assisted with the distribution of cocaine. David Duvall purchased drugs from Jackson, Jr. and assisted the organization by cooking powder cocaine into crack for distribution, and then distributing the cocaine. Lorenza Harriell assisted

Dixon with the distribution of cocaine and also went with Dixon on at least one occasion to Broward County to pick up cocaine from their source. Harriell also purchased cocaine from Dixon.

The investigation revealed that Michael Lemonious was the source of MDMA pills for both Jackson, Sr. and Jackson, Jr.   A number of telephone calls and text messages established the purchase of 500 pills by Jackson, Sr. and the attempted purchase of 500 pills by Jackson, Jr. However, after delivering the pills to Jackson, Sr. and prior to the delivery to Jackson, Jr., Lemonious was arrested by state authorities for trafficking in MDMA.

A number of intercepted telephone calls established that Lemonious arranged for the sale of 616 grams of cocaine hydrochloride to Dixon for $18,500. However, when Dixon traveled to Palm Beach County to pick up the cocaine, the money was stolen from his unoccupied vehicle. Based upon the intercepted telephone calls surrounding this event, it appears that Lemonious had additional individuals present at the pick up location and he was responsible for the theft of the money from Dixon.

In January of 2009, intercepted telephone calls established that Jackson, Sr. and Dixon were making arrangements to purchase cocaine from their source in Broward County. On January 26, 2009, surveillance was established on Dixon, and he was followed to Broward County where he purchased three kilograms of cocaine (according to Dixon, one was for himself and two were for Jackson, Sr.). Surveillance teams followed Dixon back to St. Lucie County. After observing Dixon and Jackson, Sr. arrive at their stash house location at 5007 Sanibel Avenue, Fort Pierce, agents executed a state search warrant for that home. During a search of the residence agents found and seized three kilograms of cocaine powder and a drug ledger. Dixon and Jackson, Sr. were arrested at that time for state drug trafficking charges.

Jackson, Sr. provided a post arrest statement admitting that he sold drugs in the past to supplement his income. He stated he did not bring the kilos recovered during the search of the residence. He stated that if he liked what he saw he probably would have taken the two kilograms to "hustle." As stated in the stipulated factual proffer, he also admitted that members of the narcotic trafficking organization purchased cocaine from him on a regular basis. The members of the organization would then process, package, and distribute the cocaine.

Dixon agreed to speak with law enforcement and advised agents that he transported the cocaine to the residence and the cocaine came from south Florida. He stated that he only purchased one kilogram of cocaine and the other two kilograms of cocaine did not belong to him. He also stated that for approximately the past year or so he had purchased drugs and broken them down to ounce quantities for sale in order to supplement his income.   Dixon agreed to cooperate, and he confirmed he had repeatedly purchased kilogram amounts of cocaine from Frank Pierre over the past one to two years. Specifically, Dixon stated he purchased approximately four kilograms of cocaine in December 2008, and approximately three kilograms of cocaine in January 2009 from Pierre.

During the course of this investigation, Jackson, Sr.'s source of supply was identified as Pierre. On a number of occasions, Jackson, Sr. and Dixon had telephone conversations with Pierre in reference to amounts, delivery dates and prices of cocaine. Arrangements would then be made for the pickup of the cocaine either by Jackson, Sr. or Dixon.   Jackson, Sr. and/or Dixon would purchase their cocaine from Pierre and then transport the cocaine to their "stash locations" in St. Lucie County and Brevard County, to store the cocaine.

A toll analysis of the telephone listings utilized by Jackson, Sr. and Dixon revealed they communicated on a regular basis regarding Pierre. In addition, a review of Pierre's telephone calls intercepted after the arrest of Jackson, Sr. and Dixon, confirmed Pierre had additional amounts of cocaine hydrochloride available for sale. During those telephone calls, Pierre could be heard stating he had additional amounts of cocaine available for sale and making arrangements for the sale of cocaine. Pierre was also heard making arrangements to purchase additional cocaine for large sums of U.S. currency, and arrangements to collect large sums of U.S. currency from several different persons.

From approximately the end of March until the end of May 2009, intercepted telephone calls establish that Pierre was out of cocaine and he was eagerly attempting to purchase additional kilogram quantities of cocaine. Pierre's source of supply was identified as Jean Claudy Polanco. Intercepted telephone calls established that Pierre was arranging for the purchase of cocaine from Polanco and that Polanco was making arrangements for a large shipment of cocaine from the islands.

On May 25, 2009, intercepted telephone calls confirmed that the shipment of cocaine was going to be delivered on May 26, 2009. On May 25, 2009, a number of conversations were captured between Polanco and Parson Exana during which the following conversations took place. At approximately 3:00 p.m. Polanco asked Exana, "What's the word?" Exana responded, "relaxin, good news?" Polanco stated, "Not yet." Exana stated, "On standby" and asked about a truck. At approximately 10:00 p.m. Exana told Polanco the guys just called and said six a.m. Exana also asked Polanco to find a truck. At approximately 10:55 p.m. Polanco asked Pierre for assistance in

locating a van. At approximately 11:00 p.m. Polanco told Exana he found a van and would meet him in the morning.

On May 26, 2009, at approximately 6:00 a.m., Exana told Polanco the guys did not call yet, he would call them right now. Polanco told Exana to call him back. At approximately 6:43 a.m., Exana told Polanco that he just took the freeway and he would call him when he got closer. Surveillance followed Polanco from Broward County to Jupiter, Florida, and followed the van Polanco had arranged to transport the cocaine. Upon arrival at the Home Depot off of Indiantown Road, surveillance watched Polanco drive around the parking lot a number of times in what appeared to be counter surveillance. Ultimately, Exana arrived at the same location in Jupiter with another individual, Mark Pinder.

During this same time frame, Immigration and Customs Enforcement and DEA agents in West Palm Beach, Florida were investigating the importation of cocaine from the Bahamas using a confidential source (CS). During the course of that investigation the CS introduced an undercover officer (UC) to Mark Pinder. Ultimately, arrangements were made for the importation of hundreds of kilograms of cocaine from the Bahamas to Jupiter by boat. The boat arrived in Jupiter, Florida on the morning of May 26, 2009. Based upon the prior agreement between Pinder and the CS, Pinder and Exana parked a black Expedition, to be used to pick up the cocaine, with the keys still inside the vehicle, in the parking lot of the Dunkin Donuts off of Indiantown Road in Jupiter. Pinder and Exana then went into the Dunkin Donuts. The CS then arrived at that location, got into the Expedition and drove it to a predetermined location. Nine duffel bags containing 297 kilograms of cocaine were loaded into the Expedition. This cocaine was a combination of the cocaine from the instant offense and a second conspiracy in which Exana was involved. At

approximately 8:50 a.m., the CS then drove the Expedition to the pre-determined location of the parking lot of the Home Depot off of Indiantown Road in Jupiter, parked the truck and left the area. Pinder and Exana then arrived at the Home Depot parking lot. Exana exited Pinder's car, approached and entered the Expedition. Both Pinder and Exana were then taken into custody and charged with conspiracy to import cocaine in case number 09-80063-CR-MIDDLEBROOKS in West Palm Beach, Florida.

During this time frame, Polanco received a call from the driver of the van with whom he had arranged to pick up his portion of the shipment of cocaine. The driver informed him that he was being followed and wanted to meet face to face. Surveillance observed the face-to-face meeting between Polanco and the driver of the van. During this meeting the driver of the van again informed Polanco he was being followed. Shortly thereafter, Polanco left the area and drove south at a high rate of speed. Ultimately, on May 26, 2009, both Pierre and Polanco were arrested.

Following his arrest, Pierre admitted he had been buying cocaine hydrochloride from Polanco for approximately the past two years.[1] Pierre explained that in the beginning of his relationship with Polanco, for approximately the first six months, he purchased approximately one to two kilograms of cocaine hydrochloride per week. After the six-month period of time, he worked his way up to purchasing approximately 20-25 kilograms of cocaine hydrochloride per month from Polanco. Pierre stated that on January 9, 2009, he received a shipment of approximately 50 kilograms of cocaine hydrochloride from Polanco. Pierre also stated that approximately one week later he sold Jackson, Sr. three kilograms of cocaine. Pierre also admitted that Jackson, Sr.

---

1 Prior to trial, Pierre filed a motion to suppress his post arrest statement based upon his invocation of his Fifth Amendment right to counsel. The Government agreed not to use Pierre's statement in its case in chief at trial.

and Dixon were regular customers of his. He stated that on January 26, 2009, he sold three kilograms of cocaine to Dixon. In addition, Pierre stated that he knew that a portion of the three kilograms of cocaine hydrochloride were to be delivered to Jackson, Sr., and he admitted that the three kilograms of cocaine hydrochloride sold to Dixon on January 26, 2009, came from the 50-kilogram shipment received from Polanco on January 9, 2009.

In a post arrest statement Polanco admitted to meeting with Pierre at Pierre's residence and making arrangements for the van. He also admitted that he was at the Jupiter location on the morning of May 26, 2009, for Pierre, and to knowing Exana.  He attempted to shift the blame to Pierre by saying that he (Polanco) agreed to introduce Pierre to Exana because Pierre was "hurting."

During the course of this investigation, there were controlled buys of drugs, a number of traffic stops, and several search warrants were executed. As a result of this investigation, in addition to the cocaine seized on May 26, 2009, 3,098 grams of cocaine, 109 grams of cocaine base, over 1,800 suspected MDMA pills, $130,152 in cash, 12 vehicles, and three firearms were seized. The three firearms were seized during the execution of the search warrant at Jackson, Sr.'s home.

## **PROCEDURAL BACKGROUND**

On January 27, 2009, a complaint was filed, and arrest warrants were issued for Todd Jackson, Sr. and Quentin Dixon. Dixon was arrested on February 10, 2009, and an Indictment was returned on February 12, 2009. A Superseding Indictment was returned on March 19, 2009, as to those two defendants. On April 15, 2009, Todd Jackson, Sr. was arrested. On May 26, 2009, Pierre and Jean Claudy Polanco were arrested and a complaint was filed on May 27, 2009.  On June 4,

2009, a Second Superseding Indictment was filed to include those two defendants, along with Todd Jackson, Jr., David Duvall, Lorenza David Harriell, Michael Lemonious and Parson Exana. Lemonious was arrested on June 8, 2009, Harriell was arrested on July 9, 2009, Todd Jackson, Jr. was arrested on July 10, 2009, and Exana was arrested on July 21, 2009.

On February 19, 2010, the defendant pled guilty to Count One of the Fourth Superseding Indictment which charged him with Conspiracy to Possess with Intent to Distribute five kilograms of more of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. As part of the written plea agreement, the Government agreed to dismiss Counts Six and Seven after sentencing, the Government agreed not to file a Section 851 enhancement, the Government agreed to recommend a three-level reduction for acceptance of responsibility, the defendant agreed to forfeit $447,936 in U.S. currency, the parties agreed to jointly recommend a two-level enhancement for the defendant's role, and the defendant agreed to waive his appellate rights. While not in the written plea agreement, the defendant also agreed to cooperate with the Government and testified at the trial of co-defendant Pierre.

As outlined in the Pre-Sentence Investigation Report (PSI), the defendant was involved in the conspiracy from October 1, 2008 until May 26, 2009 and was the source of supply of cocaine for Pierre of at least 447 kilograms of cocaine. The PSI outlined that the guideline for Count One, a 21 U.S.C. §§ 846 and 841(a)(1) offense, was found in § 2D1.1(a)(5) of the guidelines. That section provided that an offense involving possession with intent to distribute 150 kilograms or more of cocaine had a base offense level of 38. The defendant was responsible for 447 kilograms of cocaine. Because the defendant was a manager or supervisor, but not a leader of criminal activity that involved five or more participants or was otherwise extensive, the offense level was

increased by three levels pursuant to § 3B1.1(a). The defendant also received a three-level reduction for acceptance of responsibility. As a result, the total offense level was 38. The defendant had a total of one criminal history point and a criminal history category of I (Chapter Five, Part A).

As to Count One, the minimum term of imprisonment was ten years and the maximum term was life, pursuant to 21 U.S.C. § 841(b)(1)(A). Based upon the guideline calculations outlined above, the resulting total offense level was 38 and the criminal history category was a I. As such, the defendant's guideline imprisonment range was 235-293. On June 7, 2010, the defendant was sentenced to 235 months imprisonment. On March 8, 2011, the defendant was re-sentenced based upon his cooperation and his sentence was reduced to 156 months imprisonment.

## DISCUSSION

The defendant commenced supervised release on June 22, 2018 and is scheduled to be supervised through June 21, 2023. Per the United States Probation Officer, the defendant has remained in compliance, and is currently being supervised on a Low-Risk caseload which provides the lowest form of supervision offered in this district. The defendant resides alone at his Margate residence, and reported to the USPO in April 2020, that his wife and three children moved to the Ocala area, but they are in frequent contact. He has maintained employment at PS Auto Enterprises Incorporated, Miramar, and his duties include sales, attending vehicle auctions, and marketing. He is also employed as an Uber driver.

While the defendant appears to be in compliance with the conditions of his term of supervised release and should be commended for his efforts, given the gravity of the defendant's role in the underlying offense as outlined above, the size of the drug trafficking organization

including the importation of kilogram quantities of cocaine, the incredibly significant amount of cocaine hydrochloride for which the defendant was responsible for distributing, the defendant's prior criminal history, as well as the fact that the defendant has only completed three years of his supervised release term, the undersigned respectfully submits that the defendant's motion should be denied at this time.

## CONCLUSION

**WHEREFORE,** based upon the reasons set forth above, the United States respectfully submits that the defendant's motion for early termination of his supervised release term should be denied.

Respectfully Submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

By: *s/ Jennifer C. Nucci*
Jennifer C. Nucci (FL Bar No. 171700)
Assistant U.S. Attorney
jennifer.nucci@usdoj.gov
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida 33401
TEL: (561) 820-8711
FAX: (561) 805-9846

**CERTIFICATE OF SERVICE**

  I hereby certify that on August 31, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Jennifer C. Nucci*
Jennifer C. Nucci (FL Bar No. 171700)
Assistant U.S. Attorney

**SERVICE LIST**

**UNITED STATES OF AMERICA vs. JEAN CLAUDY POLANCO**
Case No. 09-CR-14007-MOORE
United States District Court, Southern District of Florida

**Jennifer C. Nucci**
Assistant U.S. Attorney
jennifer.nucci@usdoj.gov
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida 33401
TEL: (561) 820-8711
FAX: (561) 805-9846
Attorney for the Government
Method of Service: CM/ECF

**Sebastian Cotrone, Esq.**
The Law Office of Cotrone & Cotrone, PA
509 S.E. 9th Street
Fort Lauderdale, Florida 33316
Method of Service: CM/ECF